## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **CYNDI FISCHER, Individually,** | § | |
| **And on behalf of the Estate of** | § | |
| **JESSE FISCHER, Deceased,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  4:23-cv-1069** |
| | § | |
| **ROBERT PHILLIPS, Individually, and** | § | |
| **CITY OF ARLINGTON, TEXAS** | § | |
| | § | |
| *Defendants.* | § | |

## <u>PLAINTIFF'S ORIGINAL COMPLAINT</u>

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, CYNDI FISHER, Individually, and on behalf of the Estate of JESSE FISHER, Deceased, PLAINTIFF, complaining of ROBERT PHILLIPS, Individually, and CITY OF ARLINGTON, TEXAS, DEFENDANTS, and for causes of action will respectfully show unto the Court as follows:

> Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985).

## SUMMARY

On October 20, 2021, Arlington Police Officer Robert Phillips killed Jesse Fischer by shooting him with his department issued firearm, when Jesse was not presenting a danger to any person during a slow speed vehicle pursuit. Police responded to a 911 call that reported seeing a man, later learned to be Jesse, slumped over in his vehicle. When an officer asked him to exit his vehicle, Jesse began driving away at a low rate of speed. Officer Phillips followed Jesse. During the pursuit, Jesse drove below the speed limit, stopping at stop signs, and even stopped at a red light until it turned green. At no time was Jesse driving in a reckless or dangerous manner. The pursuit ended when Jesse turned around in a cul-de-sac, and Officer Phillips shot and killed him as he was leaving the cul-de-sac, with no civilians present or any people in harm's way.

Body camera footage and dashboard video released by the Arlington Police Department show Defendant Phillips stopping his SUV in the middle of the road at the exit of the cul-de-sac, knowing that Jesse was turning around at a speed of around five miles per hour. Office Phillips exited his vehicle and pulled out his weapon while ordering Jesse to stop. Jesse continued to drive slowly to the side and around Phillips at roughly five miles per hour. Officer Phillips then without warning fired six shots into the driver's side of the windshield of Jesse's vehicle, striking Jesse multiple times. Jesse was rushed to a local hospital, where he died as result of the gunshot wounds.

Officer Phillips was fired from the Arlington Police Department two days after killing Jesse and later indicted on a first-degree felony murder charge by a Tarrant County grand jury. Fort Worth Police Chief Al Jones addressed the shooting and Officer Phillips' termination, stating, **"The only time that you should be able to use deadly force is if you are protecting yourself or someone else. In this case, I just didn't get that."**

Cyndi Fisher, Jesse's mother now files this lawsuit against Defendant Phillips for the wrongful death of her son and for violating her son's constitutional rights under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures, by way of excessive deadly force. Jesse's mother also sues Defendant City of Arlington, Texas due to Defendant City of Arlington, Texas' failure to train Phillips on the proper response during a low-speed pursuit that presented no threat of harm and instead overtraining Phillips on discharging his firearm.

## I.
## PARTIES

1.      Plaintiff Cyndi Fisher is a resident of Tarrant County.

2.      At all times relevant to this lawsuit, Defendant Robert Phillips was an employee of the Arlington Police Department located at 620 W. Division Street, Arlington, TX 76011. Defendant Phillips can be served at his residence, or wherever he may be found. Defendant Phillips is being sued in his individual capacity.

3.      Defendant City of Arlington, Texas is a political subdivision of the State of Texas located in the Northern District of Texas. Defendant City of Arlington, Texas can be served through its City Manager, Trey Yelverton, at 101 W Abram St, Arlington, TX 76010, or wherever he may be found.

## II.
## JURISDICTION AND VENUE

4.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

5.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because all of the causes of action accrued in the Northern District of Texas.

### III.
### FACTS AND ALLEGATIONS

6.      On October 20, 2021, Arlington Police Department Officer Robert Phillips, hereinafter, ("Defendant Phillips" or "Phillips") killed Jesse Fischer, hereinafter, ("Jesse") by shooting him multiple times with his department issued firearm, while Jesse was not presenting a danger to any person during a slow speed vehicular pursuit.

7.      At all times relevant to this lawsuit Defendant Phillips was acting under the color of law as an Arlington Police Officer.

8.      On October 20, 2021, police responded to a 911 call that reported seeing a man slumped over in his vehicle.

9.      Upon arriving at the scene, the initial responding officer on scene spoke to the driver, Jesse Fischer.

10.     The officer asked Jesse if he could open his door so he could be checked out.

11.     Jesse started the ignition on his vehicle.

12.     The officer told Jesse to turn off his car and to open his door.

13.     Jesse asked if he was under arrest.

14.     The female officer replied, "turn off your car man" and "do not move this car."

15.     When the female officer asked Jesse to stay, Jesse began traveling south at a slow rate of speed.

16.     Jesse safely navigated his vehicle around a parked firetruck, remaining in his lane of travel.

17.     Jesse stopped at the intersection before legally turning right when the opportunity was safe of any other traffic or pedestrians.

18.     Defendant Phillips and the initial responding officer followed Jesse in separate vehicles as Jesse drove at a slow speed of about 20 miles per hour following traffic laws.

19.     Defendant Phillips incorrectly relayed to dispatch that, "He's all over the road. On the sidewalk. Going to be in pursuit possible DWI."

20.     However, at the time Defendant Phillips told dispatch that Jesse was all over the road on the sidewalk, Jesse had not driven all over the road nor on the sidewalk as is depicted in Defendant Phillips' dash camera video.

21.     Below is a screen capture of Jesse driving slowly in the proper of travel and avoiding other motorists and pedestrians.



22.     A few seconds later Jesse came to a complete stop at a red light at the intersection of Daniel and Arkansas.

23.     Below is a screen capture of Jesse coming to a complete stop at the red light.



24.     Defendant Phillips and the initial responding officer got out of their vehicles and Defendant Phillips began giving verbal commands from his vehicle.

25.     Defendant Phillips gave verbal instructions to Jesse to drop his keys out of the vehicle and get out of the car.

26.     Jesse asked, "what did I do?"

27.     Jesse held his hands visibly outside of his car window.

28.     Defendant Phillips stated, "**this is not going to end well for you if you do not drop those keys.**"

29.     Jesse stated, "I have a lot going on."

30.     Defendant Phillips stated," Well right now I got to deal with you, so step out of the car and do it now."

31.     At no point did Jesse make any verbally threatening statements.

32.     At no point did Jesse brandish a firearm or other weapon.

33.     When the traffic light turned green, Jesse began driving.

34.     Jesse continued driving in his lane of traffic, under the speed limit, and then stopped his vehicle at the next stop sign before proceeding through the intersection when it was safe with no traffic or pedestrians.

35.     The initial responding officer, who was driving in her vehicle behind Officer Phillips, relayed to dispatch that, "He's stopping at all the stop signs, going about twenty miles per hour."

36.     At no time did the initial responding officer relay to dispatch that Jesse was driving in oncoming lanes of traffic, driving on the sidewalk, driving all over the road, speeding, running stop signs or stop lights, or otherwise driving in a reckless or dangerous manner.

37.     This is because at no time did Jesse drive in oncoming lanes of traffic, drive on the sidewalk, drive all over the road, drive more than the speed limit, run stop signs or stop lights, or otherwise drive in a reckless or dangerous manner.

38.     Jesse turned onto a street that ended in a cul-de-sac.

39.     There were no pedestrians on the street, in the cul-de-sac, or in their yards.

40.     No other people can be seen in any dash camera or body camera videos other than Jesse, Defendant Phillips, and the initial responding officer.

41.     Jesse, driving about five miles per hour, drove into the cul-de-sac and initiated a U-turn in the cul-de-sac.

42.     Below is a screen capture of Jesse initiating a U-turn in the cul-de-sac.



43.    Defendant Phillips claimed that Jesse was going in opposite lanes of traffic.

44.    However, during the length of the pursuit, Jesse did not drive in opposite lanes of traffic and at the time Defendant Phillips radioed dispatch Jesse had initiated a U-turn in the cul-de-sac.

45.    Defendant Phillips fabricated that Jesse was driving in opposite lanes of traffic just as Defendant Phillips fabricated earlier that Jesse was driving all over the road and on the sidewalk.

46.    Body camera footage and dashboard video released by the department show Defendant Phillips stopping his department SUV in the middle of the road.

47.    Phillips exited his vehicle and unholstered his firearm.

48.    Jesse continued to drive extremely slowly at roughly five miles per hour, to the side of Phillips in what was an obvious and apparent direction of exiting the cul-de-sac.

49.    Defendant Phillips, without warning, fired six shots into the driver's side windshield of Jesse's car, striking Jesse multiple times and fatally wounding him.

50.    Below is a screen capture of Jesse continuing to drive slowly to the side of Phillips.



51.     At no time did Jesse threaten Phillips, either verbally or physically.

52.     At no point did Jesse brandish a weapon or state that he had a weapon, and no weapon was found on Jesse after Phillips shot him.

53.     During the length of the pursuit, Jesse drove away from officers and not toward any other persons at a slow rate of speed.

54.     Below is a screen capture taken from the perspective of Defendant Phillips' body worn camera and the female officer's dash camera which shows Jesse driving slowly to the side of Defendant Phillips when Defendant Phillips shot Jesse.



55.    Below is another screen capture of footage taken from the female officer's dash camera which slows Jesse driving slowly to the side of Defendant Phillips when Defendant Phillips shot Jesse.



56.    At no time did Jesse rev his engine, accelerate his vehicle, turn his tires toward Defendant Phillips or the initial arriving officer or their cars, or turn his steering wheel toward Defendant Phillips or the initial arriving officer or their cars.

57.     Defendant Phillips **<u>never</u>** gave Jesse commands to stop his vehicle before discharging his firearm.

58.     Defendant Phillips **<u>never</u>** gave warnings that he would shoot unless Jesse stopped his vehicle.

59.     Below are pictures of the windshield where Defendant Phillips' bullets entered when he shot Jesse.





60.     Jesse had not struck any vehicles or caused any damage during the slow speed pursuit.

61.     Jesse had not injured any person or threatened any person during the slow speed pursuit.

62.     Jesse had not caused any person to swerve to avoid Jesse or placed any person in danger during the slow speed pursuit.

63.     Jesse had done nothing to cause any reasonable officer to believe that he was a danger to Defendant Phillips at the moment that Defendant Phillips shot Jesse.

64.     Jeese was rushed to a local hospital, where he died.

65.     Phillips was fired from the Arlington Police Department two days after killing Jesse.

66.     According to Police Chief Al Jones, Defendant Phillips violated department policy regarding the use of deadly force, including policy which limited when officers may put themselves in the path of a moving vehicle and when they may shoot at a moving vehicle.

67.     Fort Worth Police Chief Al Jones addressed the shooting and Officer Phillips' termination, stating, **"The only time that you should be able to use deadly force is if you are protecting yourself or someone else. <u>In this case, I just didn't get that</u>."**

68.     Phillips was indicted on a first-degree felony murder charge by a Tarrant County grand jury.

69.     A press release from the Tarrant County Criminal District Attorney's Office states," A Tarrant County Grand Jury returned an indictment Thursday related to the October 20, 2022, fatal shooting of Jesse Fischer of Addison at the **end of a low-speed chase** in Arlington. Former

Arlington Police Officer Robert Phillips was indicted on a charge of murder, a first-degree felony in Texas punishable by five to 99 years of life in prison."

70.    At no point in time was Defendant Phillips in harm's way, as Jesse was driving roughly five miles per hour, attempting to exit the cul-de-sac, was not driving at Defendant Phillips but instead was attempting to drive around Defendant Phillips, had not demonstrated any level of violence or danger throughout the slow speed pursuit, and made no sudden movements toward Defendant Phillips.

### The City of Arlington Failed to Adequately Train Defendant Phillips with the Probable Outcome Being the Use of Excessive Deadly Force

71.    Defendant Phillips has only been employed as a law enforcement officer in the state of Texas by one agency – the Arlington Police Department.

72.    Accordingly, all of Defendant Phillips's training related to law enforcement in the state of Texas has been completed while employed by the city of Arlington and at the direction and under the supervision of the city of Arlington.

73.    Arlington trained Defendant Phillips throughout his entire career to use his firearm in tense and rapidly evolving situations; but failed to train Defendant Phillips not to use his firearm in those same situations when the use of deadly force was not necessary or justified.

74.    As a result of this training, Defendant Phillips used excessive deadly force against Jesse on October 20, 2021.

75.    Defendant Phillips had a service start date of March 25, 2015, with the Arlington Police Department.

76.    Throughout Defendant Phillips' nearly seven-year career as a peace officer with Arlington, the Texas Commission on Law Enforcement indicates he has 1908 hours of course training.

77.    However, from 09/01/2013 to 10/20/2021, prior to Defendant Phillips use of deadly force against Jesse, of all the hours and courses of training, over seven-year career, **a mere eight hours of training was in De-Escalation Techniques**, which Defendant Phillips received on 07/27/2018.

78.    This means that in Defendant Phillips's career, Arlington only required that **0.04 percent of his training be completed on De-escalation Techniques**.

79.    Further, Arlington only required Defendant Phillips to attend one Intermediate Use of Force course for a total of 13 hours.

80.    Instead of requiring Defendant Phillips to complete De-escalation of Force training or Use of Force training, Arlington allowed Defendant Phillips to completed hundreds of hours of discharging firearms training, with a large majority of that being S.W.A.T., Firearms, Active Shooter Response, and Tactical Entry Training.

81.    Interestingly, the week prior to Defendant Phillips's use of excessive deadly force against Jesse, Defendant Phillips completed Tactical Entry Training.

82.    Three weeks prior to Defendant Phillips' use of excessive deadly force against Jesse, Defendant Phillips completed a S.W.A.T. training.

83.    Upon information and belief, both trainings, Tactical Entry Training and S.W.A.T., included instruction on discharging a firearm during intense and rapidly involving situations but did not include training or instruction on when not to discharge a firearm during a low speed and slowly evolving non-dangerous situation.

84.    Shockingly, Arlington never required Defendant Phillips to attend – and Defendant Phillips never attended – a training on police pursuits, specifically regarding how to respond during a low-speed non-dangerous pursuit.

85.     This lack of training on de-escalation and low speed pursuits combined with overtraining on discharging a firearm in rapidly evolving and intense situations caused Defendant Phillips to react accordingly during the low-speed pursuit with Jesse. As a result, Defendant Phillips discharged his firearm instead of attempting de-escalation techniques or blocking the roadway while Jesse was driving five miles per hour around Defendant Phillips and not presenting a threat of harm to any person.

## IV.
## CAUSES OF ACTION

### Count One

### Excessive Force
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendant Robert Phillips

86.     Plaintiff repeats and re-alleges each allegation contained in the above paragraphs as if fully repeated herein.

87.     Acting under the color of law, Defendant Robert Phillips deprived Jesse Fischer of the rights and privileges secured to him by the Fourth Amendment to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of deadly force.

88.     Plaintiff brings this cause of action pursuant to 42 U.S.C. § 1983.

89.     The amount of force used by Phillips against Jesse as described above, specifically but not limited to, when Phillips fatally shot Jesse as Jesse was not suspected of a violent crime, had not committed any reckless or dangerous driving, and was not presenting an immediate risk of harm or threatening any officer or other person, and was driving away slowly around Phillips, was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, suffering, and death upon Jesse Fischer.

15

90.     A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

91.     The test of reasonableness under the Fourth Amendment requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989)

92.     Although officers may need to use "physical force ... to effectuate [a] suspect's compliance" when he refuses to comply with commands during a traffic stop, the officers still must assess "the relationship between the need and the amount of force used." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012); quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

93.     It is clearly established that it is unreasonable for a police officer to use deadly force by way of a gun against a fleeing felon in a vehicle who does not pose a sufficient threat of harm to the officer or others. *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 417 (5th Cir. 2009); *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985).

94.     As the Fifth Circuit explained, "[b]ut, 'in an obvious case,' general standards 'can 'clearly establish' the answer, even without a body of relevant case law.' As the Supreme Court has summarized, qualified 'immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021). The Fifth Circuit explained further that, "[i]n *Garner*, the Supreme Court held that '[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead.'" *Id*.

95.     The Fifth Circuit defines deadly force as force that "creates a substantial risk of death or serious bodily injury." *Aguirre v. City of San Antonio*, 995 F.3d 395, 413 (5th Cir. 2021); citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998)

96.     Claims that law enforcement unreasonably utilized deadly force are treated as a special subset of excessive force claims. *Aguirre*, 995 F.3d at 412; citing *Gutierrez*, 139 F.3d at 446; citing *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701.

97.     As the Fifth Circuit has explained, "we have long held that the use of 'deadly force' is unreasonable where the officer does not have 'probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others,' *Aguirre*, 995 F.3d at 412-13; citing *Gutierrez*, 139 F.3d at 446; quoting *Garner*, 471 U.S. at 11, 105 S.Ct. 1694.

98.     The Fifth Circuit has also stated that guns represent the paradigmatic example of deadly force. *Gutierrez*, 139 F.3d at 446.

99.     Though a fleeing motorist may pose a threat to the public so substantial that it justifies the use of deadly force, the Supreme Court has not "declared an open season on suspects fleeing in motor vehicles." *Lytle v. Bexar Cnty., Texas*, 560 F.3d 404, 414 (5th Cir. 2009).

100.    "Nearly any suspect fleeing in a motor vehicle poses some threat of harm to the public. As the cases addressing this all-too-common scenario evince, the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable." *Id*. at 415.

101.    Jesse's driving was not "so menacing...that any use of force in an attempt to stop it would be objectively reasonable as a matter of law." *Id*. at 416.

102.    Accordingly, a jury could conclude Jesse did not pose an immediate threat to the public when Defendant Phillips shot at him. *Cf. Plumhoff*, 572 U.S. at 776-77 (finding a grave risk to the public where the fleeing suspect led officers on a chase exceeding 100 miles per hour and

evaded the officers' attempt to block his car in); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (concluding the fleeing motorist posed a "great risk of serious injury" to bystanders during a "Hollywood style car chase of the frightening sort."

103.   A suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is *per se* reasonable." *Lytle*., 560 F.3d at 416.

104.   In this case, both the temporal and physical proximity to Jesse's slow-moving car attempting to safely pass Defendant Phillips by driving around him did not place Defendant Phillips in reasonable fear of being hit by the car.

105.   While Jesse was attempting to flee, he did so by slowly driving to the side and away from Phillips, he had not brandished a weapon, was not suspected of a violent crime, had not committed any reckless or dangerous driving, he did not rev his engine or accelerate his vehicle or turn his tires or vehicle toward Defendant Phillips or any other person, he had driven under the speed limit and around roughly 20 miles per hour throughout the pursuit, had stopped at stop signs and a stop light, made no verbal or physical threats, and was driving roughly five miles per hour around Phillips when Phillips fatally shot Jesse.

106.   Jesse was not threatening any officer or other person immediately prior to and when Phillips fatally shot Jesse as Jesse was slowly driving to the side and away from Phillips, he had not brandished a weapon, was not suspected of a violent crime, had not committed any reckless or dangerous driving, he did not rev his engine or accelerate his vehicle or turn his tires or vehicle toward Defendant Phillips or any other person, he had driven under the speed limit and around roughly 20 miles per hour throughout the pursuit, had stopped at stop signs and a stop light, made no verbal or physical threats, and was driving roughly five miles per hour around Phillips when Phillips fatally shot Jesse.

107.    A reasonable officer would know that the use of deadly force by shooting Jesse as he drove away slowly to the officer's side and away from him, was <u>clearly excessive</u>, when Jesse did so by slowly driving to the side and away from Phillips, he had not brandished a weapon, was not suspected of a violent crime, had not committed any reckless or dangerous driving, had driven under the speed limit and around roughly 20 miles per hour throughout the pursuit, had stopped at stop signs and a stop light, made no verbal or physical threats, was driving roughly five miles per hour around Phillips when Phillips fatally shot Jesse, and Jesse was not presenting an immediate risk or threatening any officer or other person, and who the use of deadly force was not warranted.

108.    A reasonable officer would know that the use of deadly force by shooting Jesse as he drove away slowly to the officer's side away from them was <u>clearly unreasonable</u> when Jesse did so by slowly driving to the side and away from Phillips, he had not brandished a weapon, was not suspected of a violent crime, had not committed any reckless or dangerous driving, had driven under the speed limit and around roughly 20 miles per hour throughout the pursuit, had stopped at stop signs and a stop light, made no verbal or physical threats, was driving roughly five miles per hour around Phillips when Phillips fatally shot Jesse, and Jesse was not presenting an immediate risk or threatening any officer or other person, and who the use of deadly force was not warranted.

109.    Defendant Phillips was acting under color of law as an Arlington Police Officer when he fatally shot Jesse.

110.    As a direct result of the force used against him by Defendant Phillips, Jesse suffered physical injury, pain, mental anguish, and death.

111.    These injuries were not caused by any other means.

## Count Two

**DELIBERATE INDIFFERENCE AND CAUSES OF ACTION UNDER**
***Monell v. New York City Department of Social Services***
**Violation of the 4th Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendant Arlington, Texas**

112.    Plaintiff repeats and re-alleges each allegation contained in the above paragraphs as if fully repeated herein.

113.    Municipalities, including counties and cities, may be held liable under § 1983. *Hampton Co. Nat'l Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 224 (5th Cir. 2008).

114.    A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his or her constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978).

115.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

116.    "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

117.    The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

118.   A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields*, 860 F.3d at 808.

119.   To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

120.   "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities…" *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

**Policymaker**

121.   The Arlington City Council is the "final policymaker" for the City of Arlington.

122.   Additionally, the Arlington Police Chief has been delegated policy-making authority in the area of law enforcement training and policies in the Arlington Police Department by the Arlington City Council.

123.   The Arlington Police Chief is directly involved with implementing each of the City Council's policies and practices discussed in this lawsuit, including the training of Arlington Police Officers; accordingly, he had actual knowledge of each.

124.   Alternatively, the Arlington Police Chief had constructive knowledge of the failure of the training policy at the department, as the Police Chief would have known of these practices in the department had he exercised his responsibilities.

## Policies, Customs, and Practices
## Which were Moving Force of Constitutional Violations

125.    The § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege cause the constitutional violation and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id*. The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id*.

### The City's Failure to Train

126.    "It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability." *Brown v. Bryan Cnty., Okla.*, 219 F.3d 450, 457 (5th Cir.2000) (subsequent appeal after remand of *Brown v. Bryan Cnty., Okla.*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626) (holding that a sheriff's failure to train a county deputy that resulted in constitutional violation could be county policy).

*127.*    Indeed, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id*. (quoting *City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989)*); *Oporto v. City of El Paso*, EP-10-CV-110, 2010 WL3503457, at *7 (W.D. Tex. Sept. 2, 2010).

128.    If in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need, then the failure to provide proper training may fairly be said

to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury. *City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989).*

129.    "For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 390, n. 10.

130.    The inadequacy of training must be closely related to the injury. *Pineda v. City of Houston*, 291 F.3d 325, 331–32 (5th Cir. 2002).

131.    To plead a plausible failure-to-train claim, a plaintiff must allege sufficient facts to show: "(1) the training procedures were inadequate; (2) the [city's] policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused [the plaintiff's] injury." *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).

### (1)    The Training Procedure was Inadequate.

132.    Arlington trained Defendant Phillips throughout his entire career to use his firearm in tense and rapidly evolving situations; but failed to train Defendant Phillips not to use his firearm in situations when the use of deadly force was not necessary or justified.

133.    As a result of this training, Defendant Phillips used excessive deadly force against Jesse on October 20, 2021.

134.    Defendant Phillips has only been employed as a law enforcement officer in the state of Texas by one agency – the Arlington Police Department.

135.    Accordingly, all of Defendant Phillips's training related to law enforcement in the state of Texas has been completed while employed by the city of Arlington and at the direction and under the supervision of the city of Arlington.

136.    Arlington trained Defendant Phillips throughout his entire career to use his firearm in tense and rapidly evolving situations; but failed to train Defendant Phillips not to use his firearm in those same situations when the use of deadly force was not necessary or justified.

137.    As a result of this training, Defendant Phillips used excessive deadly force against Jesse on October 20, 2021.

138.    Throughout Defendant Phillips' nearly seven-year career as a peace officer with Arlington, the Texas Commission on Law Enforcement indicates he has 1908 hours of course training.

139.    However, from 09/01/2013 to 10/20/2021, prior to Defendant Phillips use of deadly force against Jesse, of all the hours and courses of training, over seven-year career, **a mere eight hours of training was in De-escalation Techniques**, which Defendant Phillips received on 07/27/2018.

140.    This means that in Defendant Phillips's career, Arlington only required that **0.04 percent of his training be completed on De-escalation Techniques**.

141.    Further, Arlington only required Defendant Phillips to attend one Intermediate Use of Force course for a total of 13 hours.

142.    Instead of requiring Defendant Phillips to complete De-escalation of Force training or Use of Force training, Arlington allowed Defendant Phillips to completed hundreds of hours of discharging firearms training, with a large majority of that being S.W.A.T., Firearms, Active Shooter Response, and Tactical Entry Training.

143.    Interestingly, the week prior to Defendant Phillips's use of excessive deadly force against Jesse, Defendant Phillips completed Tactical Entry Training.

144.    Three weeks prior to Defendant Phillips' use of excessive deadly force against Jesse, Defendant Phillips completed a S.W.A.T. training.

145.    Upon information and belief, both trainings, Tactical Entry Training and S.W.A.T., included instruction on discharging a firearm during intense and rapidly involving situations but did not include training or instruction on when not to discharge a firearm during a low speed and slowly evolving non-dangerous situation.

146.    Shockingly, Arlington never required Defendant Phillips to attend – and Defendant Phillips never attended – a training on police pursuits, specifically regarding how to respond during a low-speed non-dangerous pursuit.

147.    This lack of training on de-escalation and low speed pursuits combined with overtraining on discharging a firearm in rapidly evolving and intense situations caused Defendant Phillips to react accordingly during the low-speed pursuit with Jesse. As a result, Defendant Phillips discharged his firearm instead of attempting de-escalation techniques or blocking the roadway while Jesse was driving five miles per hour around Defendant Phillips and not presenting a threat of harm to any person.

### (2)    The City's Policymaker was Deliberately Indifferent in Adopting the Training Policy.

148.    Arlington policymakers knew to a moral certainty that their police officers would be required to arrest fleeing felons. The city armed its officers, including Defendant Phillips, with firearms, in part to allow them to accomplish this task. Thus, the need to train officers, including Defendant Phillips, in the constitutional limitations on the use of deadly force is 'so obvious,' that

failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 390, n. 10.

149.   However, the City only required Defendant Phillips to attend 8 hours of de-escalation training, did not require Defendant Phillips to attend a police pursuit training, did not train or instruct Defendant Phillips how to respond to slow moving pursuits, overtrained Defendant Phillips on discharging his weapon, and did not train Defendant Phillips on when not to discharge his weapon during slow speed pursuits.

### (3)   Inadequate Training Policy Directly Caused Jesse's Injury and Death

150.   As a result of this inadequate training due to the City's deliberately indifferent training policy, Defendant Phillips used excessive deadly force against Jesse on October 20, 2021.

### Policies and Practices Work Together

151.   The § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege cause the constitutional violation and demonstrate a "direct causal link." *M. D. by Stukenberg*, 907 F.3d at 255; See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id*. The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id*.

152.   Arlington's lack of training on de-escalation and slow speed pursuits, in conjunction with Arlington's dedication to over training officers on discharging their firearms interacted with one another and exacerbated the harmful effects of one another, causing Defendant Phillips to use excessive deadly force in shooting Jesse on October 20, 2021.

**Count Three**

**<u>Wrongful Death</u>**

**Against Defendant Phillips and Defendant City of Arlington, Texas**

153.    Plaintiff repeats and re-alleges each allegation contained in the above paragraphs as if fully repeated herein.

154.    Plaintiff Cyndi Fischer is Jesse Fischer's mother.

155.    By reason of Defendants Phillips wrongful conduct of fatally shooting Jesse as Jesse fled without posing a reasonable, credible, or imminent threat to any person, Defendant is liable for damages.

156.    Defendant City of Arlington, Texas is also liable by reason of Defendant City of Arlington, Texas' policies and practices of having a lack of training on de-escalation and slow speed pursuits, in conjunction with Arlington's dedication to over training officers on discharging their firearms.

157.    To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

158.    Defendant Phillips' excessive use of deadly force against Jesse Fischer as described herein, violated Jesse Fischer's constitutional rights under the Fourth Amendment and caused his death.

159.    Defendant City of Arlington, Texas' deliberate indifference as described herein, caused the deliberate indifference shown toward Jesse, also violated Jesse's constitutional rights under the Fourth Amendment.

160.    Defendant Phillips' and Defendant City of Arlington, Texas' conduct that caused Jesse Fischer's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendant is liable for his acts and infliction of emotional distress caused by the wrongful death of Jesse Fischer

161.    Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**Count Four**

**<u>Survival Action</u>**

**Against Defendant Phillips and Defendant City of Arlington, Texas**

162.    Plaintiff repeats and re-alleges each allegation contained in the above paragraphs as if fully repeated herein.

163.    Plaintiff Cyndi Fisher brings this claim on behalf of the estate of Jesse Fischer.

164.    Jeese Fischer died because of Defendant Phillips' and Defendant City of Arlington Texas' wrongful conduct.

165.    Jesse Fischer would be entitled to bring this action against Defendants if he lived.

166.    The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

167.    Defendant Phillips and Defendant City of Arlington, Texas is liable to the Estate of the deceased for the loss of Jesse Fischer's life, physical injuries, pain and suffering, and the violation of his civil rights.

168.    Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

# V.
# PUNITIVE DAMAGES

169.    Plaintiff repeats and re-alleges each allegation contained in the above paragraphs as if fully repeated herein.

170.    When viewed objectively from the standpoint of Defendant Robert Phillips, at the time of the occurrence, Defendant Phillips' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

171.    As a direct, proximate, and producing cause of Defendant Phillips' reckless or callous indifference to Jesse Fischer's constitutionally protected rights, Plaintiff is entitled to recover punitive damages against Defendant Phillips.

# VI.
# DAMAGES

172.    Plaintiff repeats and re-allege each allegation contained in the above paragraphs as if fully repeated herein.

173.    Jesse's injuries and death were a foreseeable event due to Defendant Phillips knowing that shooting Jesse multiple times with his department issued firearm had a high probability of killing Jesse and Defendant City of Arlington, Texas' unconstitutional policies and practices related to training as applied to Jesse.

174.    Jesse Fischer's injuries and death were directly and proximately caused by Defendant Phillips' excessive use of deadly force against Jesse Fischer and Defendant City of Arlington, Texas' unconstitutional policies and practices related to training as applied to Jesse.

175.    As a result, Plaintiff is entitled to recover all actual damages allowed by law.

176.    Plaintiff contends Defendant Phillips' conduct constitutes malice, evil intent, or reckless or callous indifference to Jesse Fischer's constitutionally protected rights.

177.    Thus, Plaintiff is entitled to punitive damages against Defendant Phillips.

178.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiff was forced to suffer:

      a.      Actual damages;
      b.      Loss of affection, consortium, comfort, financial assistance, protection, and care;
      c.      Pain and suffering and mental anguish suffered by Jesse Fischer prior to his death;
      d.      Mental anguish and emotional distress suffered by Plaintiff;
      e.      Loss of quality of life;
      f      Funeral and burial expenses;
      g.      Loss of service;
      h.      Loss of earnings and contributions to Plaintiff;
      i.      Prejudgment interest; and
      j.      Post judgment interest.

179.    Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff seeks to recover, and requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

180.    If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

## VIII.
## JURY REQUEST

181.    Plaintiff respectfully requests a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants and further prays for all other relief, both legal and equitable, to which Plaintiff may be justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

/s/ *Breanta Boss*
BREANTA BOSS
State Bar No. 24115768

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com
breanta@scottpalmerlaw.com

**Attorneys for Plaintiff CYNDI FISHER, Individually, and on behalf of the Estate of JESSE FISCHER, Deceased**